**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ AUG 06 2008 ★

BROOKLYN OFFICE

---

STMICROELECTRONICS N.V.,

    *Plaintiff,*

    v.

CREDIT SUISSE GROUP,

    *Defendant.*

---

08 Civ. **08**

Jury Trial Demanded **3201**

SIFTON J

LEVY, M.J

## COMPLAINT

Plaintiff STMicroelectronics N.V. ("ST") brings this action against defendant Credit Suisse Group and alleges the following:

## INTRODUCTION

1.      This lawsuit seeks to recover over $415 million of ST's money that was illegally obtained by Credit Suisse Group's wholly-owned subsidiary Credit Suisse Securities (USA) LLC ("Credit Suisse Securities") as part of a multi-billion-dollar fraud against over a dozen of its customers.  (Herein, Credit Suisse Group and Credit Suisse Securities are jointly referred to as "Credit Suisse.")  Credit Suisse Group furthered the scheme instigated by its subsidiary and a group of its directors and brokers, and it continues improperly to hold nearly half a billion dollars of ST's capital, despite incontrovertible proof that it was obtained through fraud.

2.      As ST explained to Credit Suisse Securities, ST sought to manage its cash in accordance with its corporate treasury policies by placing it in highly liquid and secure investments.  ST chose to invest with Credit Suisse based on Credit Suisse Securities' false representations that it would invest ST's funds solely in highly liquid student loan

1

securities backed by U.S. government guarantees ("student loan securities" or "SLS"). Through its brokers, who served as directors of the firm, Credit Suisse Securities had also falsely touted these student loan securities to ST, claiming, among other things, that "student loans practically present no credit risk to their holders" (emphasis supplied) and that they were 100% guaranteed by the federal government. Based on these false representations, between May 2006 and August 2007, ST transferred more than $450 million to Credit Suisse Securities.

3.     In August 2007, when ST sought to liquidate a portion of its portfolio, ST learned that its funds had not, in fact, been invested by Credit Suisse Securities in the highly liquid student loan securities market. Instead, Credit Suisse Securities had orchestrated a bold and sophisticated fraud, misleading ST into believing that it was investing only in liquid, safe, and authorized student loan securities, whereas Credit Suisse Securities was actually using ST's funds to purchase illiquid, risky, and unsuitable auction rate securities ("ARS") consisting of collateralized debt obligations ("CDOs") and credit linked notes, some of which are backed by sub-prime real estate loans. None of these securities was approved by ST for purchase and none was compatible with ST's cash management policy, as Credit Suisse Securities well knew.

4.     At least a dozen other multinational corporations are victims of the same scheme carried out by the same group of brokers and directors at Credit Suisse Securities and furthered by Credit Suisse Group. ST has reason to believe that the fraud involves more than $2 billion of these clients' money.

5.     Credit Suisse Group, which at all relevant times controlled Credit Suisse Securities, has known of the illegal scheme since the summer of 2007, and it thereafter

2

furthered the fraud by keeping it hidden from victims, governmental authorities, and the investing public; and by refusing to follow the instructions of ST to liquidate the unauthorized assets. Credit Suisse Group did so because it benefited directly from the fraudulent scheme and the cover-up.

6.      Further, Credit Suisse Group's corporate policies facilitated and encouraged the fraudulent scheme from the outset. Among other things, on information and belief, Credit Suisse earned higher commissions and other fees on the unauthorized and unsuitable securities fraudulently placed in ST's and other victims' accounts than Credit Suisse would have generated from sales of authorized SLS. Credit Suisse Group knew that the Credit Suisse compensation structure created strong incentives for brokers to sell CDOs regardless of whether they were suitable or authorized investments for a given client.

7.      Moreover, by late 2006, Credit Suisse Group understood that CDOs -- particularly those linked to subprime loans -- were risky investments, and it began to decrease its own exposure to such securities. But Credit Suisse continued to purchase these securities for its clients, and it did so *without* disclosing its own assessment of the securities to investors, like ST. Credit Suisse Group benefited from and did not change the sales practices at Credit Suisse that encouraged the offloading of such securities. As a large holder of CDO securities, Credit Suisse had a strong financial interest in ensuring that these toxic securities were removed from its own books, even if it meant foisting them onto its unsuspecting customers. And that is exactly what the corrupt actions of the Credit Suisse Securities brokers and directors did. On information and belief, the fraud allowed Credit Suisse Securities to limit its exposure (and thus Credit Suisse Group's

3

exposure) to high-risk securities by shifting them to its customers; this, in turn, enabled Credit Suisse Group to tout itself to the investing public as having weathered the CDO crisis far better than its competitors, including UBS.

8.      After the illegal scheme was exposed by ST in the summer of 2007, rather than siding with the customers who had been victimized, Credit Suisse Group aligned itself with its wholly owned subsidiary Credit Suisse Securities and its corrupt brokers and directors.  Among other things, Credit Suisse Group refused to return ST's money, despite knowing that it had been invested in direct violation of ST's instructions.  On information and belief, Credit Suisse Group also chose to further and cover up the fraud by: failing to fire any of the group of directors and other brokers involved in the scheme, including the two principal Credit Suisse directors and their supervisor; permitting the two principal directors to relocate voluntarily to another investment firm; failing to alert the other investment firm of the brokers' fraudulent acts; failing to apprise Credit Suisse customers of the prohibited activity; intentionally misleading those clients who discovered the fraud about the scope of the scheme; failing to notify the Securities and Exchange Commission ("SEC") or the Department of Justice ("DOJ") of the fraud; and failing to advise the investing public of the prohibited activity.

9.      When ST confronted Credit Suisse Group about the fraud in the summer of 2007, multiple Credit Suisse Group agents, including defendant's chief operating officer ("COO") and general counsel, and the general counsel of defendant's private banking division, privately admitted that ST had been defrauded by Credit Suisse Securities. These Credit Suisse Group officers then falsely represented to ST that ST was the *only* customer deceived by Credit Suisse Securities.

10.     This falsehood was part of a concerted effort by Credit Suisse Group to shift the blame for its fraud off of Credit Suisse and onto the victims of the illegal scheme. Remarkably, Credit Suisse Group refused to take responsibility for its own employees' actions, claiming that ST should have uncovered the fraud even sooner than Credit Suisse Group.  Indeed, Credit Suisse told ST that if it attempted to force Credit Suisse to return its money through legal proceedings, Credit Suisse would make the process painful and embarrassing for ST.  And while Credit Suisse Group admitted privately that ST was a victim, Credit Suisse promised to argue publicly it was ST -- not Credit Suisse -- that was to blame for not preventing the Credit Suisse fraud.  Undeterred by Credit Suisse's "blame the victim" approach, ST filed an arbitration claim against Credit Suisse Securities, *STMicroelectronics N.V. v. Credit Suisse Securities (USA) LLC*, No. 08-00512, before the Financial Institution Regulatory Authority ("FINRA") on February 22, 2008.[1]

11.     Likewise, in its public statements, Credit Suisse has consistently put its own interests ahead of those of its victims, and even of the investing public.  Indeed, Credit Suisse's public disclosures on this topic before July 2008 were highly misleading.  Even though Credit Suisse Group knew of the fraudulent conduct at the time, Credit Suisse, which is required to report customer complaints to FINRA, made vague written statements in response to customer complaints about this fraudulent scheme and noted only that customers "allege[d]" that certain purchases made by its brokers were unauthorized.  The FINRA documents in which these Credit Suisse statements appear also contain statements from two of the corrupt Credit Suisse directors falsely claiming

---

[1] Because Credit Suisse Group is not a member of FINRA and thus not subject to arbitration, it was not named as a defendant in that action, which is still pending.

that ST had "directed each trade" at issue. One additionally said that ST had a "serious credibility issue" because of the timing of its complaint. Even though Credit Suisse has now admitted that it knew at that time of the brokers' prohibited activities (and consequently that the statements to FINRA were false), Credit Suisse did nothing to correct -- and everything to foster -- the false public impression that these brokers had done nothing wrong. And despite privately admitting to the fraud, Credit Suisse Group has flatly refused to make ST whole.

12.     Indeed, Credit Suisse has gone to great lengths to continue the public illusion that any problems were circumscribed in scope and under control. When Credit Suisse Group was faced with another CDO scandal involving fraud committed by its brokers, Credit Suisse Group again made misleading statements and material omissions. When this separate fraud became public in the winter of 2008, Credit Suisse Group misled the public regarding the extent of its employees' wrongdoing by representing that the fraud was a single, isolated event that happened despite a law-abiding corporate culture. Credit Suisse Group failed to reveal that it was aware, at that very time, of another massive multi-billion-dollar fraud also involving Credit Suisse's sales of CDOs -- namely, the fraud of which ST is one of many victims -- and that its compliance failures and potential liability were far greater than it disclosed.

13.     When the media, despite Credit Suisse's obfuscation, discovered the fraud against ST and others and made it public in July 2008, Credit Suisse again chose to spin its conduct instead of forthrightly admitting what it and its employees had done. Credit Suisse once more misled the public by minimizing the extent of the fraud, actively seeking to portray the corrupt conduct as involving no more than two "rogue" employees.

6

But the fraud was not so confined.  On the ST account alone, at least seven Credit Suisse Securities brokers and directors sent or were copied on one or more of the nearly 200 fraudulent emails falsely or misleadingly describing the investments, as Credit Suisse Group knew.

14.     Credit Suisse also continued to portray itself in the media as a responsible corporate citizen, so as not to damage its stated goal of becoming the world's "premier and most admired bank."  For instance, Credit Suisse attempted to mislead the public into believing that it had promptly and properly reported the prohibited activity when it did not in fact disclose the scheme to the DOJ or even to its principal regulator, the SEC, until its hand was forced by victims, including ST, who informed those agencies of the fraud.  And Credit Suisse never informed the public, ST, or, on information and belief, the other victims about the brokers' violations.  Indeed, Credit Suisse sought to hide the fact of the prohibited conduct from them all.

15.     Credit Suisse also improperly suggested to the public that it had taken timely and appropriate action to prevent additional customers from being victimized.  In truth, it had done nothing of the sort.  When ST confronted Credit Suisse about the fraud in the summer of 2007, one executive officer of Credit Suisse Group said that Credit Suisse would join with ST in referring two of the Credit Suisse Securities directors for criminal prosecution *if* ST quietly resolved the matter.  And far from referring them to criminal authorities, Credit Suisse allowed those two corrupt directors to resign and to report to work at another public financial institution.  On information and belief, Credit Suisse Group *never* informed that financial institution of the brokers' prohibited activity.  And

7

the other employees who worked with these brokers and participated in the scheme remained in the employ of Credit Suisse Securities -- and some remain there even today.

16.     Credit Suisse also attempted to convey the impression to the public that it was forthrightly dealing with the fraudulent conduct at Credit Suisse Securities and its ramifications. Remarkably, when Credit Suisse was forced to admit publicly for the first time in July 2008 that it had been aware for nearly a year of the "prohibited activity" of its brokers, who "violated their obligations" to Credit Suisse clients such as ST, Credit Suisse Securities at the same time was making entirely different claims in the private arbitration brought by ST; in that proceeding, it argues that ST's "claim" to have been defrauded is "suspect" and states that Credit Suisse Securities acted at all times "in good faith."

17.     Despite knowing that ST was the victim of fraud at the hands of its employees, Credit Suisse Group has not provided ST with any redress whatsoever. First, notwithstanding that it now admits that it knew of the fraud in the summer of 2007, when auctions for the unauthorized securities in ST's account were still taking place, Credit Suisse Group has consistently failed to sell the unauthorized holdings. Second, Credit Suisse Group has categorically refused to support ST's instructions to liquidate the unauthorized portfolio so that ST can recoup the funds Credit Suisse took from it under false pretenses. Instead, Credit Suisse Group has fully endorsed Credit Suisse Securities' managing the account as if ST had approved the purchase of the illiquid, unauthorized securities it contains, thereby leaving ST to bear impairments that have already reached $115 million due to the reduced liquidity and the degradation of the credit rating of the underlying securities. Meanwhile, on information and belief, Credit Suisse has taken *no*

8

write-off or reserves for the hundreds of millions of dollars in impaired and downgraded securities that its brokers fraudulently purchased for customer accounts while in Credit Suisse's employ.

18.     Credit Suisse has several improper motives for refusing to sell the securities in ST's account. The nature of the auction rate securities market has allowed Credit Suisse to continue collecting fees by making the securities available for auctions that it knows will not occur. In addition, were Credit Suisse Securities to sell the securities outside of the auction process, the full extent of the loss to ST and the other victims would be crystal clear. And, of course Credit Suisse is benefiting because, to this day, Credit Suisse has avoided the losses associated with its fraud by holding hundreds of millions of dollars of ST's money -- as well as hundreds of millions of dollars of other victims' money -- without returning a dime.

19.     As a result of Credit Suisse's actions, ST has been unable to access any of the money it invested. Because of the dramatic constriction of credit markets caused by the sub-prime loan crisis, the securities fraudulently placed in ST's account have been frozen since August 2007. Further, instead of being able to draw down its Credit Suisse Securities account to fund its operations, ST has borrowed money from other financial institutions, thus exacerbating the damages caused by the fraud and the cover-up. Moreover, ST has had to recognize significant asset impairments in its quarterly and annual results because many of the unauthorized and unsuitable securities placed in ST's account have been severely downgraded by the rating agencies from their original ratings -- at an unusually rapid pace -- and one security so far has stopped paying interest altogether because of defaults. These impairments will persist as the market for the

9

securities fraudulently purchased by Credit Suisse Securities remains illiquid. This has further harmed ST's reputation as a prudent and risk-averse investor. As these impairments persist and worsen, ST's damages continue to grow well beyond the $415 million of ST's funds that Credit Suisse Group continues wrongly to possess.

## JURISDICTION AND VENUE

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1367 as it involves a claim arising under section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, *et seq.*, together with supplemental claims under state law.

21.     This Court has personal jurisdiction over defendant because defendant has transacted and is transacting business within The State of New York and this district.

22.     Venue is proper within this judicial district under 28 U.S.C. § 1391(d) because defendant is an alien.

## THE PARTIES

23.     ST is a corporation organized under the laws of the Netherlands and has its principal offices in Geneva, Switzerland. ST is a major semi-conductor company whose shares are traded, among other places, on the New York Stock Exchange.

24.     Credit Suisse Group is a major global banking institution with six primary offices, including one in The City of New York. Credit Suisse Group is registered with the SEC as a foreign issuer, and it is the corporate parent of Credit Suisse Securities, which is wholly owned by Credit Suisse Group and is headquartered in New York.

## THE FRAUDULENT SCHEME

I. The Pitch to ST Regarding Student Loan Securities

25.     In April 2006, Credit Suisse Securities made false and misleading investment presentations to ST, both orally and in writing, touting its expertise in a specific short-term, high-grade investment: U.S. securities backed by a particular type of collateral -- 100% federally-guaranteed student loans.  Credit Suisse Securities induced ST to invest its short-term cash resources in these specific securities by stressing that they were highly liquid and, because they were fully backed by a U.S. government guarantee, virtually risk-free.

26.     Credit Suisse Group's London office, which had previously done business with ST, specifically vouched for Credit Suisse Securities in its approach to ST, and ST relied on Credit Suisse Group's imprimatur in deciding to follow the investment advice of Credit Suisse Securities.

27.     The Credit Suisse Securities presentations were exclusively about SLS and no other type of security.  Thus, for instance, Credit Suisse Securities wrote to ST on April 19, 2006:

> On the short end of the yield curve we have been instrumental in adding significant value to the USD investment needs of many companies through the 28-day Aaa/AAA rated US Government guaranteed student loan issues, which offer an attractive yield advantage over other short-term vehicles like Commercial Paper, Bank Deposits and Money Market Funds. The issuers are student loan organizations that are guaranteed by the U.S. Department of Education under the Federal Family Education Loan Program.

This communication was accompanied by a "Fact Sheet" entitled "Auction Rate Securities" bearing the Credit Suisse name and logo, which stated *inter alia* that "[t]he market consists of student loan issues, whose underlying loans are guaranteed [by the]

11

U.S. Department of Education under the Federal Family Education Loan Program ["FFELP"]."

28.    On April 20, 2006, Credit Suisse Securities made an oral presentation to ST concerning the investment of ST funds in 28-day Aaa/AAA-rated securities consisting of securitized, consolidated SLS that were 100% guaranteed under FFELP. At the conclusion of the oral presentation, Credit Suisse Securities sent ST a written brochure for SLS entitled "Student Loan ABS Executive Summary." Although government-guaranteed student loans are not 100% guaranteed, the brochure from Credit Suisse Securities misleadingly stated that they were. The brochure stated that SLS derived their Aaa/AAA rating from over-collateralization supported by the "full guarantee" of the U.S. government. It further stated: (a) "[d]ue to the secure and stable collateral together with the government guarantees, which ensure principal repayment to investors, <u>student loans practically present no credit risk to their holders</u>. . . . Since any potential defaulted principal and accrued interest on the underlying FFELP student loans is guaranteed, student loan paper has perhaps the highest quality and liquidity in the ABS market"; and (b) "[a]fter the 9/11 terrorist attacks, spreads for the student loan paper recovered more quickly than other ABS products, a testament to the liquidity and credit quality inherent in the product in the eyes of investors. This confirms our view that the Student Loan issues are widely viewed by market participants as perhaps <u>the most creditworthy and liquid</u> ABS investment." (Emphasis supplied.)

29.    The SLS were touted by Credit Suisse Securities to ST as being particularly liquid because they were purchased and sold at auction every 28 days, with the SLS holder having the option on each auction date to re-purchase the securities, or to sell them.

30.     The highly liquid and virtually risk-free profile of SLS was attractive to ST, whose corporate treasury policies do not allow investments in structured or highly speculative securities.  ST informed Credit Suisse Securities of these restrictions and explained that it was interested in SLS because of the securities' liquidity and the strict limitations on investor risk provided by the U.S. government guarantee.

31.     Credit Suisse Securities' subsequent communications with ST left no doubt as to the parties' agreed investment strategy: ST's funds were to be invested only in SLS.  For instance, in May 2006 -- the same month that ST opened its account with Credit Suisse Securities -- Credit Suisse Securities confirmed that it "completely understand[s] your yield objectives and the benefits of the Federally-Guaranteed Student Loan Market will serve you well because the investors have the power to specify via the auction process at what rate they would like to own the security."

32.     Relying on these false representations, ST opened a cash management account with Credit Suisse Securities, and on May 12, 2006, ST wired an initial $200 million to its new Credit Suisse Securities account.

II. ST's Objections to the Unauthorized Trades and Discovery of the Fraud

33.     Between May 2006 and August 2007, ST deposited over $450 million with Credit Suisse Securities, believing Credit Suisse Securities' representations that it was investing ST's funds in securities that ST had authorized, namely in the SLS investments that Credit Suisse Securities had touted to ST in the spring of 2006.

34.     The scheme nearly unraveled on July 20, 2007, when ST observed that Credit Suisse Securities had invested $21 million in a security that had an "A1/P1" credit rating, not the SLS "Aaa/AAA" rating.  ST promptly objected in writing, and Credit Suisse

13

Securities admitted that it has sold ST 30-day commercial paper and not an authorized

SLS.[2] ST re-confirmed that the only investments it authorized for its account were SLS:

"[W]hy you bought a Commercial Paper instead of the usual Student Loan? I see it is still

a Financial Institution but we would stick to the mandate to buy only Student Loan

ABS." (Emphasis supplied.)

35.     On July 23, 2007, Credit Suisse Securities falsely confirmed that the $21 million

that had been fraudulently invested in commercial paper would be "invested in monthly

Aaa/AAA rated student loan paper for settlement tomorrow."  Credit Suisse Securities

did not disclose that it had been consistently violating ST's orders to buy only SLS

issues.  Further, ignoring ST's re-affirmed written instruction to "stick to the mandate to

buy only Student Loan ABS," and in spite of representing on July 23 that it would invest

in SLS, *the very next day* Credit Suisse Securities invested ST's funds in unauthorized

and unsuitable non-SLS issues.

36.     Remarkably, Credit Suisse Securities purchased for ST's account Class V

Funding, an unauthorized CDO backed in part by subprime loans, even though Credit

Suisse had in its possession a letter dated July 20, 2007, warning investors in Class V

Funding securities that the collateral was deteriorating.  Even more remarkably, the letter

warning about the deteriorating securities was written by Credit Suisse Alternative

Capital, an indirect wholly owned subsidiary of Credit Suisse Group that managed the

collateral underlying the securities in Class V Funding.  The letter from Credit Suisse

Alternative Capital provided a clear warning that Class V Funding was a high-risk

security that was clearly unsuitable for ST.  Credit Suisse knew that if its customers were

---

[2] ST had authorized Credit Suisse to invest in commercial paper only on an *overnight* basis with highly rated financial institutions to act as a bridge between auctions.

14

to receive such a letter, many would likely demand that Credit Suisse sell their holdings. This would have put pressure on Credit Suisse brokers to find willing buyers for these unwanted securities.

37.     Customers such as ST, which were serviced from the Credit Suisse Cash Management Desk -- a department dedicated to serving companies looking for safe, stable, and liquid investments -- were not suitable recipients of securities like Class V Funding. Nonetheless, despite Credit Suisse's knowledge that these securities were inappropriate for Cash Management customers, and despite ST's mandate to buy *only* SLS, Credit Suisse Group took inadequate measures to prevent Credit Suisse Securities from purchasing the improper securities for ST's account, with absolutely no disclosure to them or other victims of the heightened risk. Credit Suisse knew that if ST's treasury department had been informed of the true nature of these securities, ST would have refused to invest in them, as they were wholly inappropriate given ST's short-term cash management strategy and needs.

38.     Shortly after this incident, ST uncovered the scheme. On August 6, 2007, at a time when the market for auction rate securities was liquid, ST issued instructions to Credit Suisse Securities to liquidate SLS positions sufficient to remit $200 million (of the approximately $476 million then invested by ST with Credit Suisse Securities) by the end of August. ST issued this direction because of its assessment that there might be a potential liquidity crunch, which made it prudent to sell a substantial portion of its investments in the Credit Suisse Securities account. Consequently, ST also instructed Credit Suisse Securities, "please do not buy other new Loans and proceed to reimburse next Loans up to that amount."

15

39.     Credit Suisse Securities brazenly ignored ST's instructions.  Later that same day, it reinvested $30.35 million of ST funds in "Independence Funding," which, as ST discovered the following day (but Credit Suisse Securities knew at the time), was not an SLS.

40.     ST immediately objected to the trade on the ground that it was outside the SLS mandate.  ST reiterated that the purchase was "not in the mandate we gave to Credit Suisse" and stated once again that any securities "with a different risk profile from the student loan" were not authorized.  ST re-confirmed its instructions to liquidate securities worth $200 million, and to sell "as soon as possible" the non-SLS securities purchased in violation of ST's instructions.  Credit Suisse Securities did not comply.

41.     Throughout August, Credit Suisse remained silent about the nature of the securities in ST's account, never once alerting ST to the fact that the account did not contain *any* student loans.  Remarkably, in August, the then (and current) Managing Director of Credit Suisse Securities' New York Private Banking division misleadingly reassured ST that it had high-quality investments in its account and that ST had nothing to worry about, without disclosing that none of the funds in ST's account was invested in SLS.  By Credit Suisse's own admission, it knew of the fraud even as its Managing Director assured ST that its investments were perfectly safe and gave a pretextual reason for its changing the team of brokers managing its account.

42.     On September 5, 2007, ST demanded from Credit Suisse a written representation that the securities in ST's portfolio were SLS.  ST instructed Credit Suisse that if any investments were not SLS they should be liquidated immediately.  Only then did Credit Suisse finally admit that none of the securities in ST's account was SLS, and that the

portfolio in fact consisted of non-SLS securities, some of which were backed by subprime loans and other risky investments.

43.    On September 12, Credit Suisse Group finally confessed to ST that directors and brokers who handled ST's account violated ST's mandate to buy only SLS. Nevertheless -- and despite ST's instructions, which were reiterated on September 27, 2007 -- neither Credit Suisse Securities nor Credit Suisse Group has liquidated the investments or repaid one cent of principal to ST. Meanwhile, Credit Suisse has continued to earn fees by holding the unauthorized securities in ST's account, even as those securities have declined substantially in value, while ST alone has been forced to shoulder the risks of the securities illegally and unilaterally foisted on it by Credit Suisse Securities. Credit Suisse Group's conduct is particularly egregious in light of the fact that, in August 2007, if ST's account had contained the SLS it had authorized Credit Suisse to purchase, ST would have been able to sell all if its holdings at face value, as the market for SLS was fully liquid until February 2008.

III.  The Details of the Scheme to Defraud ST and Others

44.    Upon its discovery of the scheme, ST investigated the methods and means used by Credit Suisse to carry out and cover up the fraud. From the very beginning, Credit Suisse Securities engaged in a bold and sophisticated scheme to defraud ST. Although the ST funds were to be invested solely in SLS, Credit Suisse Securities bought and sold non-SLS securities without ST's authorization. The badges of the fraud include: (a) Credit Suisse Securities' repeated transmission of email trade confirmations to ST that were doctored to describe falsely the securities being bought and sold on ST's behalf as SLS, when they were not; (b) Credit Suisse Securities' sending emails to ST confirming

17

that it would follow ST's instructions to invest only in SLS, and confirming that ST's funds were invested only in student loan instruments, when Credit Suisse Securities was, in fact, investing those funds in other, riskier securities; (c) Credit Suisse Securities' inquiring into whether ST could invest additional funds to purchase additional SLS, when Credit Suisse Securities had not, in fact, followed this investment strategy and did not intend to do so; (d) Credit Suisse Securities' failing to send ST prospectuses for the unauthorized securities -- a failure that is all the more serious as the prospectuses would have revealed to ST that the securities were not SLS and also that Credit Suisse was the collateral manager of some of the securities issues; and (e) Credit Suisse Securities' omission in emails to ST of the term "CDO" from the names of securities bought and sold for the account.

45.     Credit Suisse Securities deliberately sought to cause ST to believe that all of its funds were invested in SLS. Thus, and as a first badge of fraud, Credit Suisse Securities repeatedly sent email messages to ST stating falsely that ST's portfolio consisted entirely of SLS. For example, Credit Suisse Securities wrote to ST on June 14, 2006: "[i]f the deal clears at a level below our minimum [i.e., minimum target rate of return] the position is liquidated and we invest the money in overnight paper until the funds are re-invested in 28-day student loan deals." (Emphasis supplied.)

46.     Five days later, on June 19, 2006, Credit Suisse Securities invested $25.35 million of ST funds in South Coast Funding V, a sub-prime CDO security that ST had not authorized Credit Suisse Securities to purchase. At the time of the purchase, Credit Suisse Securities transmitted by email to ST a report falsely describing the security as "South Coast Funding St. Loan." (Emphasis supplied.) Such deceptive reports --

whereby Credit Suisse Securities falsely represented to ST that the security being bought or sold was a student loan instrument -- were sent repeatedly: in June and July of 2006, Credit Suisse Securities sent ST three such emails in which South Coast Funding was described as "South Coast Funding St. Loan"; and between August 2006 and August 2007, Credit Suisse Securities sent ST at least 23 more emails describing Camber Master Trust Securities -- none of which was backed by student loans -- as "Camber Funding Student Ln" (or variations thereof).  *See* Exhibit A (collecting examples of fraudulent emails).

47.    Another badge of fraud was Credit Suisse Securities' false assurance to ST that if additional funds were invested by ST, Credit Suisse Securities would use the funds to purchase SLS.  ST relied on those assurances in transmitting additional funds for investment, which were invested not in SLS but in riskier securities including sub-prime CDO issues.  For instance, after ST met with Credit Suisse Securities on July 3, 2006 to discuss ST's SLS investments, ST agreed to transfer an additional $100 million on the express condition that the funds would be invested entirely in SLS.  On July 5, 2006, Credit Suisse Securities confirmed to ST in writing that the additional $100 million "will be invested in the 28-day Aaa/AAA rated student loan issues."  (Emphasis supplied.)

48.    But shortly thereafter, contrary to ST's express representations on multiple dates that it would invest ST's funds in SLS, Credit Suisse Securities made additional investments of ST's funds in securities that were not SLS, and continued actively to conceal those investments by falsely describing the securities that had been purchased in the email confirmations that Credit Suisse Securities sent to ST.

19

49.     This pattern continued throughout the relationship. For instance, on October 31, 2006, ST told Credit Suisse Securities in writing that it needed "to sell some positions on Student Loans" (emphasis supplied) and directed Credit Suisse Securities to liquidate positions totaling approximately $102 million immediately and $135 million over the next ten days. Credit Suisse Securities replied that it would be "no problem," but failed to disclose that the securities to be liquidated were not SLS. Thus, Credit Suisse Securities sold Camber Funding securities in the amount of $73.9 million on November 2, 2006 and Credit Suisse Securities again falsely described the securities as "St. Loan" in the written communication to ST.

50.     Again, on November 13, 2006, ST informed Credit Suisse Securities that it should invest proceeds of sales of securities from ST's account in SLS: "[l]et's continue with Aaa/AAA Student Loan issues . . . targeting same criteria as before." (Emphasis supplied.) Credit Suisse Securities replied "[w]ill do." It once again failed to disclose that Credit Suisse Securities had not followed such an investment strategy. It did not intend to do so going forward either: just two days later, on November 15, 2006, Credit Suisse Securities again purchased Camber Funding, a non-SLS, and sent ST a false document alerting it that Credit Suisse Securities had purchased "Camber Funding St. Loan" securities for ST's account, in the sum of $35 million.

51.     On November 30, 2006, Credit Suisse Securities sent a false written inquiry to ST asking when ST "would try to replenish the $100 mm you took out of the student loan market a month ago." (Emphasis supplied.) Credit Suisse Securities once again misrepresented to ST that the $100 million had been taken out of the "student loan market," when, in fact, it had not been in the student loan market at all.

52.     On December 4, 2006, ST wired $80 million to Credit Suisse Securities, with express written instructions that the money was to be used "for new Student Loan investments." And on March 22, 2007, ST confirmed in writing to Credit Suisse Securities that it was about to wire another $100 million to Credit Suisse Securities "to increase our investments in Student Loans."

53.     And on June 18, 2007, Credit Suisse Securities touted to ST a purported "new 28-Day Aaa/AAA rated (Act/360) student loan deal" (emphasis supplied) and encouraged it to invest additional funds in the issue.  ST indicated that it did not have any additional money to invest, but granted Credit Suisse Securities permission to transfer some of its current holdings into the new issue.  Unbeknownst to ST, however, the new "student loan deal" to which Credit Suisse Securities was referring was not, in fact, a student loan security, as Credit Suisse Securities well knew.   Instead, it was a newly minted private placement from which, on information and belief, Credit Suisse was generating additional placement fees.  Not only was this security unauthorized by ST, but it was unsuitable for a cash management investor like ST.  Indeed, the auction for this security failed within two months of being placed in ST's account and six months ahead of the collapse of the entire ARS market.

54.     These clear instructions to Credit Suisse Securities to buy only SLS throughout the entire course of the relationship had no effect.  Credit Suisse Securities simply ignored them and continued to misrepresent to ST that it was buying and selling SLS alone.  Credit Suisse Securities knew that ST believed that its account contained only student loan securities -- indeed, the goal of the scheme was to ensure that ST believed precisely that.

55.    Remarkably, Credit Suisse now contends that it should not be held responsible for its own fraud.  Rather, it argues, ST should bear the losses because *ST* did not uncover *Credit Suisse*'s fraud soon enough.  Indeed, according to Credit Suisse, *all* of the victims of its fraud -- that is, more than a dozen multinational corporations -- are to blame for not detecting the Credit Suisse scheme earlier.  Credit Suisse bases its "blame the victim" theory on the fact that, in spite of numerous oral and written misrepresentations, including hundreds of email confirmations intended to deceive ST into believing that it possessed authorized and suitable securities when it did not, Credit Suisse's back office belatedly sent victims confirmations that contained the names of the unauthorized securities that Credit Suisse Securities had unilaterally purchased against the instructions of it clients.

56.    Credit Suisse fails, however, to address the fact that ST timely objected to the purchase of the unauthorized securities at a time that there was still a liquid market for them and ST could have been made whole if Credit Suisse had not refused to abide by the instructions of its client.  Credit Suisse also fails to account for the fact that the belated written documentation was not delivered to its clients until many weeks after the transactions were completed and often after the securities were no longer even in the client's account.  It was a central part of the fraud that, in light of the 28-day terms of the securities, customers would not rely on these "snail mail" documents, which would not necessarily reflect the account holdings at the time of receipt, but instead would look to the contemporaneous oral and written representations of the corrupt brokers.  Indeed, Credit Suisse Securities *told* ST to refer to the fraudulent email confirmations for information about its account.  And Credit Suisse knew that these illegal efforts to

22

deceive ST had their desired effect: ST was led to believe that it possessed only authorized securities.

57.      Credit Suisse Securities undertook other measures to forestall ST from learning that investments were being made in non-SLS securities.  From May 2006 to August 2007, Credit Suisse Securities invested ST's funds in 28 different issues of non-SLS securities.  In each instance, and as another badge of fraud, Credit Suisse Securities withheld from ST the private placement prospectus, which it had in its possession or control and which contained descriptions of the underlying assets and risk profile. Indeed, Credit Suisse did not provide the prospectuses for any of the securities until *after* September 2007 when ST uncovered the fraud and insisted on receiving those documents.  Furthermore, this withholding of information violates New York Stock Exchange rules (as Credit Suisse Securities well knew, since it was cited and fined by the Exchange for similar failures in September 2007), and it allowed the fraud against ST to occur undetected.  Had they been remitted to ST, the prospectuses would have enabled ST to detect that the securities were not SLS and were not compliant with ST's cash management policies.

58.      In fact, Credit Suisse Securities failed to provide a prospectus with respect to its very first unauthorized investment -- a $30 million purchase of Potomac Funding securities -- which occurred on May 17, 2006, just days after ST opened its account with Credit Suisse Securities.  Credit Suisse Securities did not, of course, reveal to ST that Potomac Funding was not an SLS issue.

59.      Credit Suisse knew that such documents were critical to their clients' understanding of their investments.  Indeed, Credit Suisse's own marketing literature

23

promised customers that, before making an ARS investment, they will be provided with "more specific information" related to the security -- information that is "extremely important and must be reviewed carefully before making the decision to invest in a particular ARS." As Credit Suisse was well aware, customers would be unlikely to uncover the fraud if they were not provided with "more specific information" about the investments Credit Suisse was making on their behalf. Credit Suisse never provided its customers with this "extremely important" information.

60.     Yet another badge of fraud was Credit Suisse Securities' omitting the term "CDO" in its email confirmations from any security that contained the term in its name, so as to minimize the risk that ST would question whether Credit Suisse Securities was purchasing unauthorized securities for its account. Credit Suisse Securities also frequently inserted the word "Funding" in its descriptions of non-SLS investments to make them seem more like student loans. These fraudulent omissions and misrepresentations took place on more than 150 occasions.

IV. The Role of Credit Suisse Group

A. Credit Suisse Group Controls Credit Suisse Securities

61.     At all relevant times, Credit Suisse Group controlled Credit Suisse Securities and its employees.

> (a) Credit Suisse Securities is a wholly owned subsidiary of Credit Suisse Group, and Credit Suisse Group incorporates the financial results of Credit Suisse Securities directly into its own financial statements. Credit Suisse Group itself defines Credit Suisse Securities as a "consolidated subsidiary" and itself

24

refers in SEC filings to Credit Suisse Group and all of its consolidated subsidiaries jointly as "we" and "us."

(b) Credit Suisse Group provides for litigation reserves against losses from legal matters in which its subsidiaries, including Credit Suisse Securities, are defendants.

(c) Credit Suisse Group presents itself and its subsidiaries as a single entity that operates on a worldwide basis, without regard to geographic or jurisdictional boundaries. This strategy is intentional. According to an April 2006 speech to shareholders given by Walter B. Kielholz, Chairman of the Board of Directors of Credit Suisse Group, "[s]ince January 1, 2006, Credit Suisse has presented itself as an integrated global bank." Mr. Kielholz stated that, to further this goal, the company would operate under "the single brand Credit Suisse" and one illustration of this unification would be that the company worldwide would be represented by a "new Credit Suisse logo." Two years later, Credit Suisse Group's CEO Brady Dougan stated that the "move to becoming an integrated bank [was] very important" and that the shift toward using "the single brand Credit Suisse for all our businesses … went extremely well."

(d) There are many other illustrations of this successful integration strategy. Among other things, the website www.credit-suisse.com does not meaningfully differentiate among Credit Suisse Group and its various subsidiaries. The United States portion of the site (entitled "Credit Suisse - USA") displays the "Credit Suisse" name and "Credit Suisse" logo -- a logo

Credit Suisse describes as "symboliz[ing] the transformation of the bank into an integrated financial services company with operations spanning the globe." The Credit Suisse Securities name appears nowhere on the homepage except in a small-print disclaimer at the bottom of the page. That unified strategy was used in connection with the implementation of the fraud here: the two initial written presentations made to ST regarding student loan securities bore the "Credit Suisse" name and Credit Suisse Group corporate logo, making no mention whatsoever of Credit Suisse Securities. As another example of its unification, the employees at Credit Suisse Group and Credit Suisse Securities have a unified email system, with addresses ending in "@creditsuisse.com."

(e) Credit Suisse Group describes its organizational structure as consisting of "three <u>global</u> divisions" -- private banking, investment banking, and asset management. (Emphasis supplied.) It suggests that all of these operations globally are supported by "Shared Services," which, according to Credit Suisse Group, deals with "finance, legal and compliance, risk management, operations, and information technology" for the entire bank.

(f) Credit Suisse Group describes its operations in cities including New York as its "[l]ocal offices," not separate companies. Likewise, Credit Suisse Group lists six "Main Offices" on its website, one of which is its headquarters in Switzerland, and one of which is in fact the New York office of Credit Suisse Securities. Credit Suisse Group, however, does not mention Credit Suisse Securities by name anywhere on that page. Instead, it simply describes Credit Suisse Securities' New York office as the address for "Credit Suisse" -- the

26

same name it uses to refer to Credit Suisse Group operations in its four other "Main Offices" in London, Tokyo, Hong Kong, and Zurich.

(g) There is overlap at the highest levels of executive leadership of the two entities. For instance, Paul Calello serves both as the CEO of Credit Suisse Group's investment bank, and as a Managing Director and Board Member for Credit Suisse Securities; and Robert Shafir is both the CEO of Asset Management and Credit Suisse Americas for Credit Suisse Group, and the CEO and a Board Member of Credit Suisse Securities.

(h) On information and belief, Credit Suisse Group's CEO works primarily out of Credit Suisse's New York offices.

62.     Since ST discovered the fraud, Credit Suisse Group's actions have confirmed its ability to control Credit Suisse Securities and have demonstrated the exercise of such control. Indeed, when ST approached defendant about the fraud, it was representatives of Credit Suisse *Group* -- not Credit Suisse Securities -- who participated in the primary discussions. Among others, Credit Suisse Group's COO and general counsel, and the general counsel of Credit Suisse Group's private banking division personally acted on behalf of Credit Suisse in its dealings with ST. For instance, it was the general counsel of Credit Suisse Group' private banking division, who, on September 21, 2007, sent ST an email claiming incorrectly that Credit Suisse had sent ST prospectuses for the securities Credit Suisse Securities had purchased, even though Credit Suisse has now admitted that it knew at the time that its brokers had defrauded ST and other victims. ST, of course, never received any such prospectuses.

27

*B. Credit Suisse Group Profited from the Fraud*

63.     Credit Suisse Group derived substantial benefits from the fraud.  Because its financial statements include results from its subsidiaries, Credit Suisse Group stood to profit -- and indeed did profit -- from the scheme.

64.     Credit Suisse Group benefited from the substantially higher commissions that, on information and belief, Credit Suisse Securities earned on the fraudulently purchased CDOs and other risky, unsuitable securities, than it received for the SLS it was instructed to buy.  These commissions were many times greater than Credit Suisse's margin on SLS.  On information and belief, Credit Suisse also earned origination fees on a number of the fraudulent sales.

65.     Credit Suisse Group is well aware of the problems its incentive structures caused.  In response to the public revelation of a separate Credit Suisse CDO scandal earlier this year, CEO Brady Dougan observed that personal profit could have been "a fairly obvious motivation" for the Credit Suisse employees' misdeeds.  "Obviously, ... to the extent, though, that if you're a trader on a book and if you intend [on] inflating the profits on your book, and people will look at your performance, and you'll get paid more because of that," he said.

66.     Credit Suisse Group also benefited from additional fees earned by its subsidiaries on certain of the securities placed in ST's account.  For instance, Credit Suisse Alternative Capital served as the collateral manager for Class V Funding -- a non-SLS security fraudulently transferred to ST -- and thereby generated additional income from these fraudulent sales.   And Credit Suisse earned additional revenue on Pivot Master

Trust securities -- the issue fraudulently described to ST in June 2007 as a "student loan deal" -- by making the initial placement of these securities on behalf of the underwriter.

67.     On information and belief, Credit Suisse Group profited further because certain securities fraudulently placed in the ST account were transferred from Credit Suisse Securities' proprietary holdings or money market funds, and/or would have appeared on its books if they had not been transferred to ST and other victims of the fraud. Credit Suisse Securities was thereby able to limit its exposure (and thus Credit Suisse Group's exposure) to high-risk securities by shifting them to its customers, which enabled Credit Suisse Group to tout itself to the investing public as having weathered the CDO crisis far better than its competitors, including UBS.

68.     In addition, on information and belief, by continuing to hold unauthorized ARS in ST's account, Credit Suisse Group is able, to this day, to earn higher fees than it would earn from more traditional, and less volatile, investments, such as SLS.

    *C. Credit Suisse Group Furthered the Fraud*

69.     First, Credit Suisse Group had an intentional strategy of reducing its exposure to ARS and CDO holdings. Avoiding exposure to risky ARS, including CDOs, was particularly important to Credit Suisse Group after late 2006; the fraud against ST served to advance Credit Suisse Group's stated strategy. Notably, Credit Suisse Group has admitted that it began to recognize by late 2006 that securities connected to subprime debt were potentially unsafe investments. As CEO Brady Dougan said, "we took some hits ... in November and December 2006. ... In March [2007] we had a bad spell, then it was good again in April and May and by the summer [of 2007] there were serious problems. But all along we had a clear view that this was a market that was going to

have difficulty.  The people involved in the business said we needed to have a more
defensive position, and so we kept exposures [to subprime securities] under control."
(Emphasis supplied.)

70.     The placement of the unauthorized securities in ST's  portfolio (and that of other
victims) served to accomplish this goal: at the end of October 2006, approximately 37%
of the holdings were non-conforming securities; but by the end of January 2007 -- just
three months later, and after the problems in the ARS and CDO markets had been
identified by Credit Suisse Group -- 100% of ST's holdings were non-SLS.  From that
point forward, Credit Suisse Securities did not place a *single* conforming security in ST's
account.

71.     And the unauthorized and unsuitable securities that Credit Suisse was dumping
into accounts of unsuspecting clients were some of the worst ARS on the market.  Indeed,
while the ARS market did not "freeze" until February 2008, the auctions for every single
security in ST's account had failed six months earlier.

72.     Second, Credit Suisse Group was aware that Credit Suisse Securities' sales
practices and deficient compliance program that encouraged the fraud also contributed to
its bottom line.  As a result, it condoned such practices, choosing consciously to avoid
obvious facts and failing to take action to thwart the plain risk of the sort of fraud that
was carried out against ST.  Among other things, it knew or should have known that:

   (a) Credit Suisse Securities customers earned virtually the same return on SLS as
       they did on CDOs and other risky ARS, but, on information and belief, Credit
       Suisse Securities generated higher fees for the firm on the latter.  In other words,

Credit Suisse captured the excess return on the riskier securities, despite the fact that the risk itself was passed onto the customers;

(b) Credit Suisse Securities was selling risky and unsuitable CDOs and other ARS through its Corporate Cash Management Desk, whose customers typically require extremely low-risk, highly liquid investments that can be treated as cash equivalents;

(c) Credit Suisse brokers' compensation was linked to the revenue they generated for the firm, and they therefore had an incentive to place as many CDOs and other risky ARS as possible in customer accounts;

(d) Credit Suisse stood to make additional profit from sales of the securities on which Credit Suisse served as the collateral manager or originator; and

(e) The CDO and ARS markets were likely to encounter liquidity and credit-rating problems as the subprime issues came to light.

73.      Credit Suisse's deficient compliance systems also resulted in customers not receiving necessary information about the investments in their accounts. The New York Stock Exchange in fact fined Credit Suisse Securities for failing to send prospectuses and other necessary material to customers -- a practice that allowed the fraud against ST to floursh. And Credit Suisse Group has admitted that its compliance systems are inadequate. In early 2008, another fraud came to light and Credit Suisse Group was forced to take a $2.65 billion write-down due to the "intentional misconduct" of its brokers involved with ABS and CDOs.  At that time, Credit Suisse Group conceded that "the controls put in place to prevent or detect this activity were not effective."  And in the wake of the scandal, Standard & Poors observed that, "[t]he incident raises significant

31

questions about the adequacy of control, valuation, and risk management procedures."
Notably, this assessment was made without Credit Suisse Group divulging the multi-billion dollar fraud that victimized ST, even though Credit Suisse Group was well aware of the fraud at the time.

74.     Despite Credit Suisse Group's awareness of its serious compliance failures -- and the fraud against its customers -- it has *still* not addressed these failures.  Astoundingly, ST continues to receive account statements from Credit Suisse Securities that include false and inflated ratings of many of the securities in its account.

75.     Third, Credit Suisse Group kept the fraudulent scheme hidden from the public, the federal authorities, and indeed from the victims themselves, for as long as possible.  For instance, in October 2007, The Wall Street Journal ran a story that came perilously close to uncovering the extensive fraud against ST and others.  In that story, an attorney for two of the corrupt brokers said that only *one* misleading email had been sent to a customer, and that that this occurred when one of the brokers was out of the office.  Credit Suisse Group knew from its own documents that this was patently false, but it did not correct the story.  Credit Suisse's obfuscation, however, does not end there.  In the same story, Credit Suisse itself stated misleadingly that it was still "reviewing" the matter of its brokers' conduct, even though it now has admitted that when it made that statement, it had *already* known for at least two months that the brokers had engaged in "prohibited activity" that violated their obligations to their clients.  Credit Suisse further downplayed the extent of the problem, saying falsely that the issue affected a "limited number of clients" with whom Credit Suisse was in "active discussions."  Through this statement, Credit Suisse plainly sought to cover up the nature and massive scale of the fraud.

76.    Credit Suisse pursued a similar strategy with the regulators and investing public, attempting to disclose as little as possible about the conduct of its brokers and directors in an effort to sweep a multi-billion-dollar fraud entirely under the rug.  As noted above, *see* ¶ 11, Credit Suisse failed to disclose to FINRA what it knew about the fraud and failed to correct the misleading statements made by Credit Suisse Securities and its brokers in the FINRA filings.  Furthermore, it did not go to the DOJ or SEC until victims of the Credit Suisse fraud had already alerted those agencies to the scheme. *See* ¶ 14.

77.    Consistent with this strategy of concealment, over the past eight months Credit Suisse Group has consistently portrayed itself in the press as one of the few major financial institutions that avoided substantial exposure to toxic securities.  For instance, in February 2008, Credit Suisse Group CEO Brady Dougan boasted to Bloomberg News that the bank "managed our risks very well over certainly the past few years, but particularly notably over the last eight months."  As a result of such statements, Credit Suisse Group enjoyed favorable press coverage, with The New York Times naming it runner-up for "bank of the year" for having "steered clear of the quick-money strategies that came back to bite its peers," and The Financial Times comparing it favorably to rival UBS, praising Credit Suisse Group for its "new culture, enhanced controls and rigour on risk" that prevented it from recognizing write-downs of the magnitude taken by UBS. Despite the fact that Credit Suisse Group knew that it had as much as $2 billion -- or more -- in exposure to frozen, rapidly deteriorating securities because of the fraud at issue here, it has never even hinted at this fact to the press or the public.

78.    Likewise, in March 2008, when it discussed the other CDO fraud that had recently come to light, Credit Suisse sought to mislead the investing public by

downplaying the compliance issues and CDO fraud, representing the problem as one relating only to "a small number of traders." Credit Suisse failed to mention entirely that it was sitting on another multi-billion dollar fraud related to CDOs, which involved many other Credit Suisse employees and additional compliance failures. And Credit Suisse has admitted that at the time when it issued its March 2008 statement misleadingly downplaying the CDO fraud at Credit Suisse, it had known for months about the CDO fraud perpetrated by Credit Suisse against ST and other Credit Suisse clients.

79.     When a second story in The Wall Street Journal finally forced Credit Suisse to comment publicly about specific allegations of broker misconduct relating to the accounts of ST and others on July 8, 2008, it issued a statement again designed to mislead the investing public about the fraud:

> Nearly a year ago, we detected prohibited activity by two former cash management employees who were immediately suspended. These two employees, who resigned in September 2007, violated their obligations to Credit Suisse and to our clients. We promptly notified our regulators when this matter arose last year and we have continued to work closely with them.

80.     The Credit Suisse statement is highly disingenuous. It aims to create the false impression that Credit Suisse acted swiftly, decisively, and appropriately as soon as the fraud came to light. It did no such thing. Instead, it did not fire any of the brokers implicated in the scheme and allowed the two brokers now under DOJ, SEC, and FINRA investigation to leave *voluntarily* and join Morgan Stanley, where they would be dealing with the investing public. It did not tell Morgan Stanley of their "prohibited activity" or their violations of their "obligations to … clients." More importantly, Credit Suisse did not alert the investing public to this serious misconduct. Moreover, the statement's implication that Credit Suisse acted to protect its customers could not be further from the

truth. To the extent Credit Suisse's claim to have "detected" the "prohibited activity" nearly a year ago -- i.e., July 2007 -- is true, Credit Suisse did not report the problem to ST or protect its account. Instead, it waited for ST to discover the fraud and confront Credit Suisse about it. And even then it refused to return any of the $415 million it wrongly obtained from ST.

81.     Furthermore, Credit Suisse's claim to have known about the "prohibited activity" for a year is starkly inconsistent with its private statements in the arbitration brought by ST against Credit Suisse Securities, where Credit Suisse Securities continues to say it acted at all times in good faith and does not concede that its brokers "violated their obligations" to ST or engaged in any "prohibited activity."

82.     Indeed, Credit Suisse continues to boast of its superior performance in comparison to its competitors. When Credit Suisse Group announced its financial results for the Second Quarter of 2008 ("Q2") on July 25, its Chief Financial Officer ("CFO") commented on the bank's exceeding analysts' forecasts, saying, "[a]t a time when many competitors are questioning their business models, our strategic direction is clear and consistent." CEO Brady Dougan echoed his CFO, touting the bank's focus on "risk and cost management" and stating that, in Q2, Credit Suisse Group "continued to reduce [its] risk positions as [it had done] since the early stages of the credit crisis." Of course, analysts and the investing public were entirely unaware that, on information and belief, Credit Suisse Group's entire Q2 profits were far less than the amount its brokers had wrongfully taken from its customers and for which Credit Suisse was potentially liable.

### D. Credit Suisse Group Prevented ST from Obtaining the SLS to Which It Is Entitled

83.     As noted above, *see* ¶¶ 3, 8-9, ST uncovered unauthorized securities in its account in the summer of 2007 and alerted Credit Suisse. In September, Credit Suisse Group privately conceded that Credit Suisse Securities brokers had intentionally disregarded ST's instructions by placing unauthorized and unsuitable CDOs and ARS in its account, rather than the SLS that it had purchased.

84.     Nonetheless, since August 2007, Credit Suisse Group has, without exception, failed to follow the instruction of ST to liquidate its account and refused to make ST whole. Instead, Credit Suisse continues to earn fees by placing the securities up for auctions that it knows will not occur because the market for auction rate securities has been frozen for months; and it has forced ST to shoulder the full impairment resulting from the deteriorating creditworthiness and illiquidity of the securities that would never have appeared on ST's books absent Credit Suisse's fraud.

### FIRST CAUSE OF ACTION
(Violation of Section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq.)

85.     Plaintiff realleges paragraphs 1- 84 hereof with the same force and effect as if here set forth at length.

86.     Credit Suisse Securities and the corrupt Credit Suisse Securities brokers, through the use of instrumentalities of interstate commerce, committed an intentional and reckless violation of section 10(b) of the Securities and Exchange Act of 1934 and SEC Rule 10b-5, by engaging in deceptive practices, making untrue statement of a material fact, and misleadingly omitting material facts in connection with the purchase of securities.

36

87.     Credit Suisse Group is liable for the damage caused to ST by the fraud. Credit Suisse Group is a "controlling person" of Credit Suisse Securities and its brokers within the meaning of Section 20(a) of the United States Securities and Exchange Act of 1934, as amended, 15 U.S.C. § 78a, et seq. Credit Suisse Group is therefore liable for the damage caused to ST by the fraud.

88.     Credit Suisse Group participated culpably within the meaning of the statute in the fraudulent scheme by actively furthering and recklessly failing to prevent the fraud; profiting from it; and willfully maintaining possession of funds it knows to be rightfully ST's.

89.     By reason of the foregoing, ST is entitled to be put in the position it would have occupied if Credit Suisse had not violated ST's mandate, to wit: an order directing Credit Suisse Group to remit to ST (a) the full face value, plus accrued interest, of the federally-guaranteed student loan securities that ST authorized Credit Suisse Securities to purchase for its account, and (b) all costs that ST has incurred because of the fraud, including but not limited to the cost of borrowing money to fund its operations; the value of opportunities foregone because of ST's inability to access the money it invested with Credit Suisse Securities; and (c) the reduction in stock price and all other damages caused by ST's reported impairments of the Credit Suisse investments between August 2007 and the present.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting Common Law Fraud)

90.     Plaintiff realleges paragraphs 1-84 hereof with the same force and effect as if here set forth at length.

91.     After gaining actual knowledge of the fraud perpetrated by Credit Suisse Securities and the corrupt brokers, Credit Suisse Group lent substantial assistance to that fraud; failed to intervene or disclose that fraud under circumstances requiring it to do so; concealed the fraud from its victims, including ST, and the investing public; made affirmative misrepresentations concerning the nature of the investments in ST's account and the risks associated with those investments that enabled the fraud to continue unabated; and failed to comply with ST's instructions beginning in August 2007 to sell the securities in its account and revert the proceeds to ST.

92.     By reason of the foregoing, ST is entitled to an order directing Credit Suisse Group to remit to ST (a) the full face value, plus accrued interest, of the federally-guaranteed student loan securities that ST authorized Credit Suisse Securities to purchase for its account, and (b) all costs that ST has incurred because of the fraud, including but not limited to the cost of borrowing money to fund its operations; the value of opportunities foregone because of ST's inability to access the money it invested with Credit Suisse Securities; and (c) the reduction in stock price and all other damages caused by ST's reported impairments of the Credit Suisse investments between August 2007 and the present.

## THIRD CAUSE OF ACTION
### (Conversion)

93.    Plaintiff realleges paragraphs 1-84 hereof with the same force and effect as if here set forth at length.

94.    Credit Suisse Group failed to comply with ST's instructions beginning in August 2007 to sell the securities in its account and revert the proceeds to ST.  By refusing to follow ST's directives, Credit Suisse Group thereby converted ST's property.  Credit Suisse Group should therefore be required to transfer all the funds it would have received if it had complied with ST's instructions when they were first given.

95.    Credit Suisse Group's conduct constituted a knowing violation of ST's rights. Credit Suisse Group has been aware of the "prohibited activity" of the Credit Suisse Securities brokers for nearly a year, and it has conceded that ST is a victim of the brokers' fraudulent scheme; yet it has refused to remit to ST any of the money currently in its possession that was wrongfully obtained from ST. By taking these actions, Credit Suisse Group has exercised possession and control over property in which ST holds a superior possessory interest. Owing to Credit Suisse Group's egregious conduct, ST is entitled to punitive damages and the attorney's fees and costs associated with pursuing this action.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

96.    Plaintiff realleges paragraphs 1-84 hereof with the same force and effect as if here set forth at length.

97.    To the extent the Credit Suisse obtained commissions and other fees on purchases (including re-investment purchases) and sales of non-SLS securities for ST's account,

Credit Suisse Group was unjustly enriched and, as a matter of equity, should be required to disgorge all such fees and commissions, and to remit such sums to ST.

98.     To the extent that (a) Credit Suisse transferred non-SLS securities from its own accounts to ST's account; or (b) Credit Suisse transferred non-SLS securities to ST's account that, in the absence of the transfer, would have reverted to Credit Suisse, Credit Suisse Group was unjustly enriched and, as a matter of equity, should be required to remit to ST a sum equivalent to the amount ST paid for those securities.

WHEREFORE, STMicroelectronics N.V. respectfully requests that the Court enter an award in its favor as follows:

1.     For an order directing Credit Suisse Group to provide ST with relief equivalent to rescission of the unauthorized transactions, to wit: an order directing Credit Suisse Group to remit to ST the full face value, plus accrued interest, of the federally-guaranteed student loan securities ST authorized Credit Suisse Securities to purchase for its account.

2.     For an order directing Credit Suisse Group to remit to ST the fair market value of the ST portfolio at the time ST first demanded that the securities contained therein be liquidated.

3.     For disgorgement of commissions or other compensation received by Credit Suisse on purchases and sales of non-SLS securities for ST's account, and the award of all such funds to ST.

4.     For the costs and disbursements of prosecuting this action, including the fees and expenses of counsel.

5.     For all costs that ST has incurred as a result of the fraud, including but not limited to the cost of borrowing money to fund its operations and the value of opportunities foregone because of ST's inability to access the money it invested with Credit Suisse Securities.

6.     For punitive damages of at least twice the loss.

7.     For appropriate pre-award interest.

8.     For such other and further relief as the Court may consider just and proper under the circumstances.

Dated: August 6, 2008

JENNER & BLOCK LLP

By: _____

Andrew Weissmann
Matthew W. Alsdorf
Joseph McFadden
Elisabeth Genn

Jenner & Block LLP
919 Third Avenue, 37th floor
New York, New York 10022
Tel: (212) 891-1650

*Attorneys for Claimant*
*STMicroelectronics N.V.*